Jerry Houston STONE

v.

The UNITED STATES.

No. 580–81C.

United States Claims Court.

Jan. 6, 1984.

Ray C. Norvell, Decatur, Ga., for plaintiff.

Lori F. Fischler, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

In this military pay case, plaintiff Jerry Houston Stone seeks a determination that he is entitled to disability retirement pay retroactive to the date when plaintiff last performed active duty in April 1971 or at least to the date of his discharge on November 13, 1975. In the alternative, plaintiff asks the Court to remand his case to the appropriate administrative board for a review of his claim for disability retirement compensation.

Defendant moved for summary judgment and plaintiff thereafter filed his cross-motion for summary judgment. For the reasons discussed herein, the defendant's motion is granted, the plaintiff's cross-motion is denied, and the petition is dismissed.

### Factual Background

On December 19, 1966, plaintiff Jerry H. Stone enlisted in the United States Army for an initial term of three years. Plaintiff completed basic and advanced training and, on July 22, 1967, received a letter of commendation noting his "fine attitude, initiative, and professionalism, and high academic standing." Thereafter, plaintiff was assigned to active duty with the 4th Battalion (Airborne) in the Republic of Vietnam. In November 1967, plaintiff sustained wounds to his right hand and arm. No hospitalization was required, however, and plaintiff returned to duty shortly thereafter. On February 10, 1968, plaintiff received an Army Commendation Medal for Heroism in connection with a combat engagement near Dak To in the Republic of Vietnam. Thereafter, plaintiff was promoted to the rank of sergeant. After completing his tour of duty in Vietnam, plaintiff returned to the United States, where he was assigned to the 82nd Airborne Division at Fort Bragg, North Carolina.

On March 25, 1969, plaintiff reenlisted in the U.S. Army for an additional six-year term and specifically requested assignment to Vietnam. Plaintiff was returned to Vietnam and was assigned to the 75th Ranger Battalion. In September 1969, plaintiff again sustained wounds to his right arm. These wounds also did not require hospitalization and plaintiff returned to duty. On October 21, 1969, plaintiff was awarded the Air Medal "for meritorious achievement while participating" in combat activities. Thereafter, on February 10, 1970, plaintiff was treated at a field hospital by a physician who noted in a medical report that plaintiff was "threating [sic] with a loaded weapon and hysterical * * *." Noting that "this has occurred in recent past since he [plaintiff] was lone survivor in recent firefight," the treating physician prescribed Thorazine and "Med Evac." On the following day, the medical report indicates plaintiff's condition to be "much better today. Coherent and oriented." The doctor prescribed Librium and ordered plaintiff not to take part in any combat missions for a four- to five-day period. On February 13, 1970, the doctor noted that Librium was not controlling plaintiff's anxiety and ordered that he be treated with Thorazine.

Thereafter, on February 28, 1970, plaintiff was hospitalized for "psychiatric evaluation of severe episodes." The examining physician made an initial diagnosis of "schizophrenic reaction, acute and undifferentiated * * * type. *Severe.* Predisposition: Borderline personality, excessive combat exposure." It was recommended that plaintiff be transferred to Japan for further treatment.

On or about March 1, 1970, plaintiff was transferred to the 106th General Hospital in Japan, where he was treated for eleven days. Plaintiff's condition was diagnosed as "Depressive reaction, chronic, rule out schizophrenic reaction, pseudopsychopatic [sic] type." An entry was also made in plaintiff's medical records indicating that

this condition existed prior to service but was "service aggravated."

On or about March 14, 1970, plaintiff was transferred to the United States Army Hospital at Fort Gordon, Georgia. After two weeks at the Fort Gordon hospital, plaintiff's attending physician, Dr. John R. Lashley, prepared the following evaluation of plaintiff's mental condition:

> MENTAL STATUS: On arrival to our psychiatry floor after transfer, SGT Stone appeared completely alert, oriented, very relaxed, handsome and cooperative. His facies were normal. He spoke very fluently and meaningfully. His thought content revealed nothing abnormal at all. His affect seemed completely appropriate. His sensorium seemed essentially clear. His judgment seemed very good. His IQ seemed above average and his insight was moderate.
>
> COURSE IN HOSPITAL: SGT Stone adjusted quite satisfactorily and helpfully on our psychiatry floor. On no medications he did very well and immediately began looking forward to returning to duty after a weekend pass home. He maintained this vastly improved state without any medications and so I decided to offer him the opportunity of returning to duty as long as it was in the United States, with an S-3 profile.[1]

Upon plaintiff's release, Dr. Lashley replaced the earlier diagnosis of plaintiff's condition:

> Reaction, psychoneurotic, dissociative type, acute, severe, manifested by sudden hysterical behavior, a sudden dimunition [sic] of contact with reality, sudden threatening of violence which probably was in response to hallucinating that ene-

my were all about him; treated and vastly improved.

> STRESS: Moderate; prolonged and excessive combat in Vietnam; "Survivor's guilt."
>
> PREDISPOSITION: Uncertain.
>
> IMPAIRMENT: Mild for further military duty; minimal for social and industrial adaptation.

Plaintiff was given a 90-day psychiatric profile for his "emotional disorder" and returned to active duty in the United States with limitations against "assignment to isolated areas where medical care [was] not available" and against "assignment to combat." In addition, Dr. Lashley directed that the plaintiff report to a medical facility on July 3, 1970, for further profile evaluation or treatment. There is no record that plaintiff sought further treatment.

On April 6, 1970, the Army assigned plaintiff to the U.S. Army Infantry Center at Fort Benning, Georgia. Plaintiff completed an instructor training course in airborne training and thereafter served at Fort Benning as an airborne instructor. Plaintiff was honored on July 10, 1970, when the Army authorized him to accept and wear a Gallantry Cross with Bronze Star which had been presented to plaintiff by the Republic of Vietnam. Thereafter, plaintiff received a Good Conduct Medal and, additionally, a letter of appreciation which commended plaintiff on his ability as an airborne instructor.

In May, 1971, the FBI arrested and incarcerated plaintiff for various alleged felonies committed on U.S. Government property at Fort Benning. Thereafter, a federal grand jury returned a six-count indictment against plaintiff, charging him with kidnap-

---

1. The Army medical profile system classifies military members according to temporary or permanent functional limitations on their ability to perform military duties. *See* Army Regulation (AR) 40-501, chapter 9. Dr. Lashley indicated a profile on plaintiff of "T-3" under heading "S" in item number 5 of DA Form 8-274. The "S" indicated that psychiatric functions called for an assignment limitation; the "T" that the limitation was temporary; and the "3" that:

> [T]he individual has medical condition(s) or physical defect(s) which require certain restrictions in assignment within which the individual is physically capable of performing full military duty. Such individuals are not acceptable under procurement (entry) standards in time of peace, but may be acceptable in time of partial or total mobilization. They meet the retention standards, while in service, but should receive assignments commensurate with their functional capability. AR 40-501 para. 9-3(c).

ping, assault with a dangerous weapon, assault with intent to rape, disabling and maiming, aggravated sodomy and rape. *United States v. Stone,* 472 F.2d 909, 910 (5th Cir.1973), *cert. denied,* 449 U.S. 1020, 101 S.Ct. 586, 66 L.Ed.2d 482 (1980). On September 9, 1971, plaintiff was convicted by a jury sitting in the United States District Court for the Middle District of Georgia. Plaintiff subsequently was sentenced to three concurrent life terms plus thirty-two years. Following sentencing, plaintiff was confined at the United States Penitentiary at Terre Haute, Indiana.

On September 29, 1971, the United States Army initiated administrative proceedings to discharge plaintiff under regulations which provide for the discharge of servicemen who are convicted by civil authorities of crimes for which the maximum penalty under the Uniform Code of Military Justice is death or imprisonment exceeding one year. *See* AR 635–206. Plaintiff appealed the judgment of the district court to the United States Court of Appeals for the Fifth Circuit, however, and the Army suspended discharge proceedings pending the outcome of plaintiff's appeal. On March 26, 1973, the Fifth Circuit court affirmed plaintiff's conviction. *United States v. Stone, supra,* 472 F.2d at 917. The Army received notice of the decision of the circuit court in October 1973 and renewed its processing of plaintiff's discharge. The Army requested the plaintiff to sign a medical waiver which would clear the way for processing his administrative discharge.

On October 31, 1973, plaintiff's prison caseworker, Mr. James W. Tippy, informed plaintiff's former military commander, Captain Stephen W. Carey, that plaintiff would not sign a medical waiver for the possible administrative discharge because "he still

has a bullet in his arm from Vietnam, suffers from a partial hearing loss, and has a mental profile from the Army." Plaintiff was apparently referring to his temporary medical profile of April 3, 1970, which expired July 3, 1970. On January 8, 1974, plaintiff specifically requested a medical board because of his "physical and mental disabilities." [2] Plaintiff also wrote several letters during this period requesting the Army to review his federal criminal conviction and to return him to military custody.

On January 23, 1974, the Army requested Marion Penitentiary officials (the penitentiary to which he had been transferred) to provide a means for plaintiff to obtain a physical and mental examination to determine if he was "unfit for duty" and then, if necessary, to assist in providing a medical board. By letter dated March 4, 1974,[3] plaintiff's prison caseworker advised Captain Carey that security reasons precluded plaintiff's release to a military installation to attend a medical board proceeding or to undergo a medical examination. Plaintiff had previously escaped from prison and was considered a security risk. The caseworker stated, however, that there was no objection to military officials coming to the penitentiary to conduct a board and/or examination.

On March 13, 1974, Captain Carey recommended to Army superiors in his chain of command that plaintiff be administratively transferred and assigned to a unit at the closest military installation to Marion, Illinois, to facilitate administrative processing of plaintiff's discharge. Captain Carey noted in this letter that plaintiff had requested a medical board. This recommendation was forwarded through military channels for action at the U.S. Army Military Personnel

---

**2.** A medical board determination that a service member is unfit for duty is the first step in the medical disability retirement process. From such a determination, the matter is referred to a Physical Evaluation Board which reviews the unfitness determination and decides the issue of entitlement and degree of disability. *See* AR 40–501, ch. 3.

**3.** This letter was apparently in response to Captain Carey's letter of January 23, 1974, which does not appear to be in the record of this case. In addition, on February 21, 1974, Captain Carey wrote a letter to plaintiff informing him that they were in the process of considering a medical discharge or discharge pursuant to AR 635–206 (administrative discharge).

Center (MILPERCEN), Alexandria, Virginia.

On September 12, 1974, MILPERCEN requested a legal opinion from the Office of The Judge Advocate General of the Army (OTJAG) as to whether medical evaluation of plaintiff was required or whether he could be processed for discharge for his civil conviction without a medical examination.[4] It is noted therein that paragraph 7, AR 635–206 "does not provide for a medical evaluation of an individual who is not physically under military control, and is being processed under that regulation." AR 635–206 requires medical evaluation only when the service member is "under military control." Para. 7, Change 8.

On October 21, 1974, the Administrative Law Division, OTJAG, issued an opinion stating that there was no legal objection to processing plaintiff for discharge pursuant to AR 635–206 without medical evaluation. Notwithstanding this legal conclusion, however, that office suggested that the case be referred to the Office of the Surgeon General of the Army (OTSG) for "determination as to whether a medical evaluation specified in Paragraph 7, AR 635–206, is appropriate."

On October 25, 1974, a request for an opinion was made to the OTSG as to the need for a medical board. On January 2, 1975, the Chief of the Evaluation and Inquiries Branch, OTSG, Dr. (Colonel) Troy J. Beeler, responded that plaintiff's Army medical records show that plaintiff suffered "a temporary medical condition in 1970 more than a year prior to the offenses of which convicted. He was returned to duty without symptoms." Dr. Beeler continued: "There is nothing in the currently available records to indicate need for a medical board and/or medical separation."

On January 28, 1975, based on the OTJAG and OTSG opinions, MILPERCEN advised that in the absence of additional medical evidence indicating a need for a medical board, a board of officers should be convened to determine whether plaintiff should be discharged for his civil conviction.

By letter dated May 7, 1975, plaintiff was formally advised by his immediate commander at Fort Benning, now Captain R.L. Pettitt, that he was being considered for discharge for civil conviction pursuant to AR 635–206, and of his rights in the proceeding, including his right to have military counsel appointed to represent him. In response, on May 16, 1975, plaintiff requested appointment of military counsel and consideration of his case by a board of officers.

On July 24, 1975, a board of officers convened at Fort Benning, Georgia, to determine whether plaintiff should be discharged in view of his civil conviction. Plaintiff was represented by Captain Henry L. Gillis, a member of the State Bar of Georgia, and on active duty with the Army JAG at Fort Benning. At this time, Captain Gillis stated that plaintiff requested that the board not convene until he could be present personally, and that he was being transferred to the federal prison in Atlanta for that purpose.

Captain Gillis also requested additional time to prepare plaintiff's case. The Board concurred in Captain Gillis' request for additional time, and recessed after receiving exhibits concerning the case from the board's recorder.

Among these exhibits were two mental evaluations of the plaintiff performed in 1971 concerning his claimed insanity defense to the charges for which he was convicted and his competence to stand trial. Both a psychologist and a psychiatrist had testified on their opposing views at plaintiff's trial. *United States v. Stone, supra,* 472 F.2d at 912. In one exhibit, Clinical Psychologist Paul F. Mandeville, Ph.D., advised plaintiff's defense attorney by letter

---

4. The MILPERCEN request for an opinion erroneously stated that plaintiff had suffered additional combat gunshot wounds on April 23, 1968, involving the right foot, left thigh, scrotum and urethra. This statement was apparently based on a medical record which is a part of plaintiff's OMPF, but which on close examination (the name block is somewhat blurred) appears to pertain to another soldier wounded in Vietnam and initially treated at the same Army hospital as plaintiff in Japan.

dated July 6, 1971, of his assessment of plaintiff's mental condition. Dr. Mandeville concluded by stating:

I consider the client to possess a personality pattern disorder characterized by features of both an inadequate and paranoid personality type; the client is neither psychotic nor neurotic at this time; he is felt to possess sufficient understanding and self organization given his present structured living situation to deliberate realistically issues of right and wrong generally though not likely with reference to the alleged episode of rape; and the history as provided by the client strongly suggests acute schizophrenic episodes occurring at intervals in his past. It is not expected the client could assist you unravel his behavior relative disturbed episodes in the past reviewed at a later point in time [sic].

In a letter dated August 24, 1971, psychiatrist J.A. Raines, M.D., advised the Assistant United States Attorney handling plaintiff's case. After reviewing the available medical records, including Dr. Mandeville's evaluation and the prior medical report by Dr. Lashley, Dr. Raines noted the various diagnostic labels used concerning plaintiff, and concluded that all agreed, as he did, that no psychosis was present:

I do not feel that the defendant is presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or to properly assist in his own defense. The psychological report indicates Dr. Mandeville's feeling that the patient is not capable of assisting in his own defense. This is based on the impression that his memory of events surrounding any particular incident might well be blurred or unable to be called into clear focus. The patient's ability to understand the current situation, the nature of his questions concerning my role and his ability to clearly describe antecedent events as well as more recent events would, in my judgment, indicate his ability to understand the current proceedings and also to participate in them. In effect his description of his inability to remember clearly certain episodes is in part assisting in his own defense by communicating these facts to his attorney or to those of us who have had an opportunity to examine him.

In response to the second question as to whether or not the defendant was criminally insane at the time of the alleged offense on April 30, 1971, I find it necessary to give a qualified answer. In my judgment this is a young man who harbors considerable potential for violence which was exacerbated by his training and subsequent combat experience. The remainder of the history strongly suggests that the sudden and inappropriate expression of such underlying aggression is facilitated by the use of alcohol. As noted in the psychological evaluation and in other areas of the history, the patient does harbor strong feelings regarding the subject of marital fidelity. The patient's description of his activities prior to the alleged offense indicate the presence of alcohol in the form of beer and liquor. It is my opinion that given the combination of his underlying personality and the affect [sic] of alcohol he would still be capable of appreciating whether or not his conduct was right or wrong. However the influence of alcohol in combination with his personality creates a situation where he is not able to conform his conduct to the standards required by society in general or in this specific instance to the requirements of the law. This is amply documented by previous episodes where his reactions have been violent and inappropriate for the occasion with little or no evidence of his ability to control such behavior.

On September 2, 1975, the board of officers reconvened. Plaintiff was again represented by Captain Gillis who stated that prison officials would not release plaintiff to attend the board hearing and that Army regulation permitted the Board to continue in plaintiff's absence.[5] The board recorder

5. AR 635–206, Para. 6 clearly contemplates that a discharge board may go forward in the

presented plaintiff's Army medical records and service records for the board's consideration. Captain Gillis outlined plaintiff's superior record of service with two combat tours in Vietnam, and the circumstance of plaintiff's "battle fatigue" in Vietnam. He stated that plaintiff did not want to be discharged from the Army, but if that was to be done, plaintiff thought a medical discharge was appropriate, rather than discharge for civil conviction. At the close of the evidence, the board deliberated and recommended that plaintiff be discharged from the service for his civil conviction, but that he receive an honorable discharge because of his superior record of service prior to his convictions. The board found plaintiff "undesirable for further retention in the military service because of his civil conviction and apparent mental problems."

On October 3, 1975, the Assistant Adjutant General of the Infantry Center, acting for the Center Commander, approved the recommendation of the board. On November 13, 1975, plaintiff was honorably discharged from the Army.

On December 26, 1976, plaintiff submitted an application to the Veterans Administration (VA) for disability benefits. In his application, plaintiff indicated that his "service-connected disability" was his hospitalization and treatment in 1969 for a "mental disorder." On January 14, 1977, the VA sent letters to plaintiff informing him that his military records had been requested and arrangements were being made for this physical evaluation.

On February 14, 1977, plaintiff was examined for the VA at the federal penitentiary in Atlanta by Dr. Jack R. Jarvis, a neuropsychiatrist. Dr. Jarvis interviewed the plaintiff and had access to his prison medical records. Except for a "small metallic body" revealed in an X-ray of plaintiff's right forearm, plaintiff was described as physically and mentally normal:

> In summary, we're dealing with a very neatly dressed veteran of medium build, well groomed in appearance with a very pleasant, friendly manner. Associative

processes are normal. There are no delusional or hallucinatory elements. Mood is normal. Sensorium is intact. He is not psychotic. He is competent. Regarding classification, there are at least three significant elements. The veteran in appearance, manner, expression, modulation and flow of speech at this examination is entirely normal. Veteran has been closely confined since 1971, and has shown no evidence of psychotic or significant emotional disorder. The examiner had access to the medical prison files. No examiner, including the undersigned, has considered him psychotic, nor unable to distinguish right from wrong. * * * On the basis of existing information, it follows that the veteran's past actions have not been the result of mental disease. On the basis of the normal current examinations, and seven years of close observation without significant incident, the following certification is made:

DIAGNOSES:

1. No psychiatric disease found.

2. Multiple shrapnel wounds without objective findings.

3. Malaria; history of.

On March 30, 1977, the VA issued a Disability Rating Decision denying plaintiff disability. The VA concluded that plaintiff's physical condition was not disabling and that plaintiff suffered a "Personality Disorder (constitutional or developmental abnormality) or Nervous Condition which was not a disability under the law for which compensation may be paid." This rating decision was based upon Dr. Jarvis' findings and upon plaintiff's Army medical records.

Following receipt of an extract of plaintiff's prison medical record from the staff surgeon and chief medical officer of the United States Penitentiary in Atlanta, Georgia, the VA reconsidered plaintiff's claim for disability. This extract showed that plaintiff had been given a psychiatric evaluation in 1973 and was found "not mentally ill" and "competent to stand trial."

service member's absence where the member is confined by civil authorities.

On May 4, 1977, the VA again denied plaintiff's claim, noting:

> The evidence does not warrant any change in our previous determination as to the following condition(s): Service connected malaria and service connected multiple scars, residuals [sic] gunshot wound, evaluated zero percent disabling. The additional medical evidence does not establish service connection for a nervous condition.
>
> Your claim will remain in a disallowed status since your evaluation of zero percent for your service connected disability is not to a convincable [sic] degree.

In addition to the medical records that have been generated by the plaintiff on active duty in the service, as a result of his arrest and conviction, and pursuant to his application for disability ratings from the VA, the plaintiff has also generated medical records at the various federal penitentiaries in which he has been incarcerated since conviction in 1971. On November 18, 1971, plaintiff underwent an admission physical at the U.S. Penitentiary in Terre Haute, Indiana. The examination report indicated that his psychiatric condition was normal. At this time, plaintiff listed his condition as "fair" and indicated that he experienced various symptoms of nervousness or depression. He also stated that he had been treated in a mental hospital for "combat fatigue." While plaintiff's prison medical records show that plaintiff complained of nervousness on occasion, there is no evidence that plaintiff has been mentally disabled during the past 10 years. In 1972, plaintiff's records indicate that he spent 26 days in the hospital for viral hepatitis. There is no mention in the reports of any mental disorders. On May 2, 1973, plaintiff was admitted to the Medical Center for Federal Prisoners in Springfield, Missouri, for a psychiatric evaluation following his escape from the penitentiary at Terre Haute. Two doctors reviewed plaintiff's prison medical records and central file as well as conducted an interview with the plaintiff. These doctors found plaintiff "very cooperative and courteous. He was oriented and appropriate displaying no unusual or bizarre behavior." The doctors concluded that Stone was not mentally ill and was competent to stand trial for his escape. As late as October 29, 1980, plaintiff's medical data sheet still states that the only time plaintiff was "treated for a mental condition" was in "1969 and 1970 Vietnam."

On June 20, 1978, plaintiff filed a petition *pro se* with the United States Court of Claims seeking active duty military pay and allowances for the period from the date of his incarceration on May 2, 1971, through the date of his discharge from the Army on November 13, 1975. The Government moved for summary judgment, and on January 26, 1979, the Court granted that motion. In its order granting defendant's motion, the Court of Claims held that plaintiff's absence from duty while he was incarcerated was not "excused as unavoidable" within the meaning of 10 U.S.C. § 503(a) and that plaintiff therefore was not entitled to receive back pay. *Stone v. United States,* 219 Ct.Cl. 604, 618 F.2d 119 (1979). On March 2, 1979, the Court summarily denied plaintiff's motion for reconsideration of its decision. *Stone v. United States,* Ct.Cl. No. 292–78 (Order March 2, 1979).

On October 6, 1981, plaintiff filed with the Court a document styled "Motion for New Trial and Complaint for Benefits and Allowances." In his motion, plaintiff alleged that newly-discovered evidence indicated that he suffered from Post Traumatic Stress Disorder (PTSD), a condition commonly referred to as "Vietnam Veterans Syndrome." Such evidence, plaintiff asserted, established that he suffered from PTSD at the time he was arrested and incarcerated and that his absence from active duty while he was incarcerated was therefore excused as unavoidable. On March 12, 1982, the Court of Claims denied plaintiff's motion as being untimely brought. *Stone v. United States,* Ct.Cl. No. 292–78 (Order, March 12, 1982). In doing so, the Court stated that plaintiff had been aware of this "newly discovered evidence" (the plaintiff's military records which would allegedly establish that he was mentally ill

when he committed the crimes involved) in 1978. The Court also stated that, in effect, plaintiff was challenging his legal responsibility for the criminal acts for which he was convicted, an argument previously considered and rejected by the Fifth Circuit Court of Appeals in affirming his conviction.

However, in its brief opposing plaintiff's motion, defendant failed to address plaintiff's complaint for benefits and allowances. The Court therefore did not dismiss that part of the claim and the action remained on the docket. In an accompanying opinion (*Stone v. United States*, 4 Cl.Ct. 264 (Cl. Ct.1984), this Court rules today that plaintiff's suit for benefits and allowances could have, and should have, been raised in plaintiff's 1978 action and, therefore, plaintiff's suit is *res judicata*.

On September 24, 1981, plaintiff filed the present action in the Court of Claims seeking a determination of his entitlement to disability retirement pay.

### Discussion

Before this Court in this action, plaintiff seeks a determination that he was disabled by reason of a service-connected disability and thus is entitled to disability retirement pay from April 29, 1971 (the last date he performed active duty service) or at least from November 13, 1975 (when he was discharged from the Army).

The thrust of his argument appears to be that as of April 29, 1971, he suffered from PTSD as a result of his combat experiences in Vietnam. Consequently, plaintiff alleges, he failed to meet the Army's minimum retention standards and should have been granted a medical disability discharge. Plaintiff repeatedly argues that certain negligent acts of the defendant contributed to plaintiff's alleged disability. Moreover, plaintiff attributes his criminal acts to

---

6. To the extent that the plaintiff is alleging a claim of negligence, such a claim sounds in tort and is not within the jurisdiction of this Court. 28 U.S.C. § 1491 (1976). This Court, and its predecessor, has consistently recognized this statutory limitation upon its jurisdiction. *See, e.g., Hargrove v. United States*, 1 Cl.Ct. 228,

PTSD and contends that but for that negligent conduct on the part of defendant, he never would have committed those criminal acts.[6] In the alternative, plaintiff argues that the Court should remand his case to a Physical Evaluation Board for administrative review of his claim to disability retirement status and pay.

Defendant alleges that plaintiff's claim is barred both by this Court's six-year statute of limitations and by laches. Defendant further asserts that plaintiff's present claim is one which plaintiff could have raised in his 1978 action for back pay and that the present claim, therefore, is *res judicata*. Finally, defendant argues that, in the event this court determines plaintiff's action is not barred by the statute of limitations, laches or *res judicata*, the plaintiff has failed to exhaust his administrative remedies and the Court should suspend proceedings and remand plaintiff's case for further administrative review by the Army Board for Correction of Military Records.

### I. Plaintiff's Action Accrued Upon Plaintiff's Discharge

In *Friedman v. United States*, 159 Ct.Cl. 1, 310 F.2d 381 (1962), *cert. denied sub nom. Lipp v. United States*, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963), our predecessor Court, the United States Court of Claims, conducted an extensive analysis of the special nature and accrual of claims for disability retirement. "Congress has entrusted the military boards with the task of determining whether a serviceman should be retired for disability and therefore * * * no cause of action arises (and the statute of limitations [will not begin to] run) until a proper board has acted or declined to act." *Id.* 159 Ct.Cl. at 13, 310 F.2d at 389. Using this rationale, the Court articulated the following rules:

230 (1982); *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 751–52, 508 F.2d 817, 822 (1974); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 659, 663, 428 F.2d 1241, 1249 (1970); *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 609, 372 F.2d 1002, 1008 (1967).

(*a*). The judicial claim for disability retirement pay does not accrue on release from active duty but rather on *final* action of a board competent to pass upon eligibility for disability retirement (or upon refusal of a request for such a board).

(*b*). Normally, the Retiring Board is the proper board, but where the claimant has not had or sought a Retiring Board, his claim does not accrue until final action by the Correction Board (which in that instance stands in the place of the Retiring Board as the proper tribunal to determine eligibility for disability retirement).

(*c*). A board's action (or failure to act) is not final if (i) the claimant has been misled, (ii) the board's decision is tentative and invites reopening, (iii) the armed service itself reopens the case, or (iv) there are other circumstances depriving the action or non-action of finality.

(*d*). Once a final decision is had, the claim accrues, the limitations period begins to run, and there is no tolling of the statute by reason of further applications to other boards or agencies (including the Correction Board).

*Id.* at 24, 310 F.2d at 396.

In formulating these rules, the Court sought to strike a very difficult balance: that of giving plaintiff sufficient time to bring suit for late-discovered or developing claims and being "fair to the Government in that [the rules] * * * would not normally allow too great a time to elapse between suit and the facts on which the claim is predicated * * *." *Id.* at 36, 310 F.2d at 402. Taking a realistic view of claims for disability, the Court rejected the argument that a decision by the Correction Board, in all occasions, should start a new six-year period of statute of limitations.

[V]eterans who never applied for a Retiring Board because they did not know they were ill or did not appreciate the progressive or serious character of their disease or disability will not be cut off by limitations from pursuing their late-discovered claim before the Correc-

tion Board and this court. We cannot, of course, know the precise statistics but it seems probable that the class of those who never had or sought a Retiring Board and later applied to the Correction Board includes a large proportion of men whose disabilities were discovered or became aggravated after release. On the other hand, those servicemen who were sufficiently alerted to the possible existence of a disability to ask for or appear before a Retiring Board will properly be cut off after six years from that time; their request for (or appearance before) a Retiring Board would normally put them on adequate notice of the existence of their claim.

*Id.* at 34–35, 310 F.2d at 401.

Disability retirement claims for those servicemen "sufficiently alerted to the possible existence of a disability," accrue upon a denial of a request for determination by a retiring board (now called Physical Evaluation Boards—PEB). *See Skopic v. United States,* 178 Ct.Cl. 202, 203 (1967); *Cayce v. United States,* 170 Ct.Cl. 402, 403 (1965). Where a serviceman is aware of his disability, this Court has even held the claim to accrue when the serviceman is informed by the Army that his claim will not be heard by a retiring board, even though no board was first requested. *Miller v. United States,* 175 Ct.Cl. 871, 879, 361 F.2d 245, 249 (1966). In *Miller,* the Court reasoned that "although the plaintiff did not himself request that his case be referred to an Army retiring board * * * the Army itself gave consideration to the question * * *. * * * This alerted the plaintiff to the Army's adverse position * * *." *Id.* at 878–79, 361 F.2d at 249–50. In reaching this conclusion, the Court relied on the reasoning of the Supreme Court:

The Supreme Court has said that statutes of limitations are "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Railroad Telegraphers v. Ry. Express Agency,* 321 U.S.

342, 348–349 [64 S.Ct. 582, 586, 88 L.Ed. 788] (1944). They are "founded upon the general experience of mankind that claims which are valid, are not usually allowed to remain neglected". *Riddlesbarger v. Hartford Insurance Co.*, 74 U.S. (7 Wall.) 386, 390, 19 L.Ed. 257 (1868). *Id.* at 879, 361 F.2d at 250.

■ Application of the *Friedman* rules, the foregoing case law, and their underlying rationales to the plaintiff's case, leads to the conclusion that plaintiff's disability retirement claim accrued on November 13, 1975, when he was discharged from the Army.

In October 1973, when the Army was notified that the circuit court had denied plaintiff's appeal for reversal of his earlier convictions, the Army reactivated its attempt to administratively discharge the plaintiff. The Army notified the plaintiff of its intentions and advised the plaintiff of his procedural rights, including the right to consult with and be represented by military counsel. The plaintiff accepted Captain Gillis, JAGC as his counsel and requested a hearing before the discharge board of officers. The plaintiff also advised the Army in writing and by telephone that he thought he should receive a medical board, *i.e.* medical disability retirement, instead of being discharged administratively for conviction by civil authorities. Plaintiff's requests for disability retirement were reiterated by the plaintiff himself, his caseworkers and by Captain Gillis throughout the Army's processing of his discharge between October 1973, and November 1975. The Army was sensitive to plaintiff's requests, and sought evaluations of them by both the Office of The Judge Advocate General and the Office of the Surgeon General. Both Army Commands thoroughly evaluated the plaintiff's medical and service records and concluded that disability retirement processing of plaintiff's case was unnecessary, as the records would not support it. Thereafter, his military command agreed and scheduled an administrative discharge board of officers to hear the plaintiff's administrative discharge case, and advised plaintiff's attorney accordingly.

At the hearing conducted on September 2, 1975, Captain Gillis again reiterated plaintiff's desire to be given a medical (disability) discharge as opposed to an administrative discharge. After hearing all the evidence, the Board concluded that the plaintiff should be administratively discharged by reason of his civil convictions. The plaintiff's military command concurred in the Board's recommendation on October 3, 1975, and he was discharged on November 13, 1975.

In view of the above discussion, it is clear that plaintiff was finally refused his medical board-disability retirement processing request as of the date when the Army finally and unequivocally said no to his medical processing requests. This date was no later than his discharge date of November 13, 1975, and could well be October 3, 1975, when the last Army official that could change the result acted on the plaintiff's elimination board decision. The plaintiff was finally aware, however, on November 13, 1975, of the Army's position on his medical disability retirement request, and that such request had been categorically refused. Thus, plaintiff's claim accrued on November 13, 1975.

## II. Laches

The plaintiff filed this claim on September 24, 1981, some five years and 10 months after the claim first accrued. Although this timeframe is within the six-year absolute statute of limitations, the claim nevertheless is barred by the doctrine of laches.

The Court of Claims recently stated:

Laches is a "fairness" doctrine by which relief is denied to one who has unreasonably and inexcusably delayed in the assertion of a claim. Failure to act promptly will operate as a bar to recovery where the delay results in injury or prejudice to the adverse party. The doctrine of laches is based upon considerations of public policy, which require, for the peace of society, the discouragement of stale demands. It recognizes the need for speedy vindication or enforcement of

rights, so that courts may arrive at safe conclusions as to the truth. As an equitable defense, laches is applied apart from, and irrespective of, statutes of limitations.

*Deering v. United States,* 223 Ct.Cl. 342, 347, 620 F.2d 242, 244 (1980) (quoting *Brundage v. United States,* 205 Ct.Cl. 502, 504 F.2d 1382 (1974)); *see also Goeppner v. United States,* 3 Cl.Ct. 345, 347 (1983); *Adkins v. United States,* 228 Ct.Cl. 909, 912–13 (1981); *Quirk v. United States,* 227 Ct.Cl. 780, 782 (1981); *McGahey v. United States,* 213 Ct.Cl. 717, 718–19, 553 F.2d 105 (1977); *Cason v. United States,* 200 Ct.Cl. 424, 431, 471 F.2d 1225, 1229 (1973).

The Court in *Deering* noted further that: [O]ur statute of limitations [is] not * * * an absolute entitlement to a grace period in which to sue but rather * * * an outside limit beyond which Congress has determined claims are simply too stale to be litigated fairly. Implicit in the statute of limitations period is a shorter period in which laches may apply, should a particular plaintiff have unreasonably delayed and caused some prejudice to the Government * * *.

*Deering v. United States, supra,* 223 Ct.Cl. at 348, 620 F.2d at 245.

■ The doctrine of laches, therefore, requires proof of both inexcusable delay by a plaintiff in filing the suit and prejudice to the defendant. *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); *Brundage v. United States,* 205 Ct.Cl. 502, 509, 504 F.2d 1382, 1386 (1974), *cert. denied,* 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975). As will be shown below, both elements are present here and plaintiff's suit, brought two months prior to the "outside limit" set by Congress, and over a decade after he last performed active duty in the Army (ending with his arrest and incarceration on May 2, 1971), is clearly barred by laches.

As to the first element of inexcusable delay, plaintiff offers no explanation for his failure to bring suit for over ten and one-half years during which he had full knowledge of his alleged medical condition.

While plaintiff's suit may be saved from outright bar under the statute of limitations by the lengthy administrative processing of his discharge, for laches purposes, plaintiff can be charged with delay dating back to May 2, 1971.

Where on notice of his claim and where plaintiff could have but failed to bring suit, he may be charged with periods of inexcusable delay even though such periods occurred prior to the accrual of the claim for limitations purposes.

*Adkins v. United States, supra,* 228 Ct.Cl. at 911 (citing *Deering v. United States,* 223 Ct.Cl. at 351 n. 3, 620 F.2d at 246 n. 3); *Plant v. United States,* 222 Ct.Cl. 682, 684 (1980); *Frommhagen v. United States,* 216 Ct.Cl. 1, 5–7, 573 F.2d 52, 55–56 (1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1219, 59 L.Ed.2d 457 (1979).

Plaintiff was treated for "combat fatigue" in 1970 at several Army medical facilities. In 1971, plaintiff sought to avoid responsibility for his criminal conduct on the basis of a mental condition allegedly arising from his Vietnam service. This claim was rejected by the district court and the United States Court of Appeals for the Fifth Circuit. *See United States v. Stone, supra,* 472 F.2d at 913. On plaintiff's prison admission forms in 1971, plaintiff indicated that he experienced symptoms of nervousness and that he had been treated for "combat fatigue." In February 1974, plaintiff wrote to Army officials stating he had "a mental profile" and asked the Army to "intercede to insure [his] health and well being and proper treatment."

Plaintiff also had knowledge of his right to claim disability. On January 8, 1974, plaintiff specifically requested a medical board because of alleged "physical and mental disabilities." The reason for the delay in his ultimate processing for discharge for civil conviction was this claim by plaintiff for disability retirement, and the substantial consideration given to the issue of whether there was a sufficient basis for the claim to render medical processing appropriate. It was only after requesting opinions from the Office of the Surgeon Gener-

al, the Judge Advocate General of the Army and plaintiff's military commander, that it was determined that disability processing was not required by plaintiff's medical history.

The Army notified plaintiff as early as May 1975 that he would not be discharged for disability. Plaintiff had the benefit of an attorney at that time and could have pursued his disability claim. His military attorney did raise the issue before the board of officers considering plaintiff's discharge for civil conviction. That board of officers gave much consideration to plaintiff's medical records, and declined to recommend his retention in the service or to indicate that consideration by a medical board was appropriate.

After his discharge on November 13, 1975, plaintiff could have immediately made an application to the Army Board for Correction of Military Records seeking disability retirement. He did not do so.

Plaintiff did, however, amply demonstrate his ability to pursue a claim. In December 1976, plaintiff made an application to the VA for service-connected disability benefits alleging that he had a mental disorder which arose in 1969 in Vietnam. That claim was denied on March 30, 1977. On June 20, 1978, plaintiff, acting *pro se*, filed his first suit in this court seeking pay for the time between his arrest and incarceration and his discharge.

Thus, plaintiff's lack of diligence in pursuing his claim for disability retirement from the Army is clear. Plaintiff has slumbered on his rights for over a decade since he last served in the Army, and for over five years and ten months since his administrative discharge became final. *See Quirk v. United States, supra,* 227 Ct.Cl. at 782. During these years, plaintiff was aware of the alleged basis of his asserted disability, was aware of his right to claim disability, and amply demonstrated the ability to pursue whatever claim he might choose. He chose, however, to first claim disability retirement with the filing of this lawsuit on

September 24, 1981, and now asks this court to "evaluate facts of the distant past * * * too long after the events occurred * * * at a time when the past cannot be reconstructed with any pretense of accuracy." *Friedman v. United States,* 159 Ct.Cl. 1, 34, 310 F.2d 381, 401 (1962), *cert. denied sub nom. Lipp v. United States,* 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963).

■ Given this ten-year delay, it is also clear that the United States and the doctors and officers involved have been prejudiced. Prejudice to a defendant includes the fading of memory of witnesses on questions of fact and the loss of documentary evidence.[7] In a disability retirement case such as this, where a medical condition is at issue, the inability to locate the treating physicians coupled with the faded memories of those who can be located results in severe prejudice to the defendant. "[T]he examining doctors * * *, if found, can hardly be expected to recall observations made at least a decade ago. The administrative record is hardly an adequate substitute." *Quirk v. United States, supra,* 227 Ct.Cl. at 783.

■ This Court has stated on numerous occasions that the longer the delay, the less need there is to search for specific prejudice and the greater the shift to plaintiff to demonstrate the lack of prejudice. *Cason v. United States, supra,* 200 Ct.Cl. at 431, 471 F.2d at 1229; *see also Quirk v. United States, supra,* 227 Ct.Cl. at 782–83. Given the substantial and unreasonable delay by plaintiff in bringing his claim for disability, a "reasonable presumption" of prejudice arises, *Devine v. United States,* 208 Ct.Cl. 998, 1001, 529 F.2d 532 (1975), and the burden shifts to plaintiff to show lack of prejudice. *Adkins v. United States, supra,* 228 Ct.Cl. at 912. The ten years which have passed since plaintiff served in the Army, with the attendant fading of memories, preclude plaintiff from discharging this burden.

■ Accordingly, plaintiff's disability claim is barred by the doctrine of laches and the petition will be dismissed.

7. *See* footnote four of this opinion.

### III.   Res Judicata

In addition to plaintiff's claim being barred by laches, the plaintiff's suit is also precluded by the doctrine of *res judicata.*

■  The doctrine of *res judicata* provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981). A plaintiff who splits his claim and fails to include his entire demand in his first suit will have, as a result, to give up the part on which he fails to sue the first time. *Container Transport Int'l, Inc. v. United States,* 199 Ct.Cl. 713, 717, 468 F.2d 926, 928 (1972). This is because the interests of the parties, of the courts, and of the public require that there be an end to controversies that have been litigated to a final conclusion. *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); *Bander v. United States,* 161 Ct.Cl. 475, 481 (1963) (per curiam).

There are numerous tests used to determine what constitutes a "claim" for purposes of *res judicata. See* 1B J. Moore, *Moore's Federal Practice* § 0.410[1], at 350 (2d ed. 1983). However, our predecessor court, the U.S. Court of Claims, has set forth its "test" in *Container Transport:*

> The modern trend with respect to the defense of former adjudication is to insist, first, that a plaintiff raise his entire "claim" in one proceeding, and second, to define "claim" to cover all the claimant's rights against the particular defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

*Container Transport Int'l, Inc. v. United States, supra,* 199 Ct.Cl. at 718, 468 F.2d at 928. In this instance, plaintiff's "claim" arises out of the same set of operative facts as his prior action in 1978, that of his right to monetary benefits stemming from his incarceration and conviction in 1971 and his consequent administrative discharge in 1975.

The Court of Claims has said that "if the claimant, before filing its first suit, is in possession of all the facts on which its second suit is based, the splitting of the claims into multiple suits is fatal to maintenance of the later-filed action." *Everett Plywood Corp. v. United States,* 206 Ct.Cl. 244, 252, 512 F.2d 1082, 1087 (1975).

■  In 1978, plaintiff brought an action for back pay and allowances for the period from his incarceration on May 2, 1971, until his discharge in 1975. The Court held that plaintiff was not entitled to such relief because "[d]ue to his own serious misconduct, [he] was confined by civil authorities and was unable to perform his duties for the Army. His absence could not be and cannot be excused as unavoidable." *Stone v. United States,* 219 Ct.Cl. 604, 606, 618 F.2d 119 (1979). When plaintiff brought that action, he had full knowledge of his alleged medical disability for which he now seeks disability retirement pay and of the Army's determination that he was not so entitled. The relief which he sought in that action is an alternative and arose out of the same set of circumstances to that which he seeks today and should have been pled in the alternative in his 1978 suit.

Proper use of the judicial system requires that one bring all of one's claims stemming from a single event to be finally resolved at one time. One cannot simply remain silent as to alternative claims for relief only to return to the courts at a later date. The plaintiff had full knowledge of this claim arising out of the same operative facts as those in his prior action and should have asserted it in that action. Accordingly, plaintiff's claim is also barred by *res judicata.*

### CONCLUSION

In view of the above discussion and legal conclusions, the defendant's motion for summary judgment is granted, the plaintiff's cross-motion for summary judgment is denied, and the Clerk is directed to dismiss the plaintiff's complaint.