**Cortrell L. LOWE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 06–121 C.

United States Court of Federal Claims.

Nov. 15, 2007.

Cortrell L. Lowe, pro se, plaintiff.

Lauren S. Moore, Commercial Litigation Branch, United States Department of Justice, and Anthony C. Williams, Office of the Judge Advocate General, United States Marine Corps, for the defendant.

## OPINION AND ORDER

BLOCK, Judge.

Plaintiff Cortrell L. Lowe ("plaintiff"; "Lowe"), proceeding *pro se*, filed the present action against the United States government on February 13, 2006. Plaintiff, a former Marine, asserts six monetary claims against defendant arising out of his service in the Marine Corps and a 1997 court-martial resulting in plaintiff's imprisonment, forfeiture of pay, and dishonorable discharge. Before the Court is defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC").

For the reasons stated in this opinion, the Court denies defendant's motion to dismiss on the ground of the period of limitations but grants defendant's motion with respect to Counts I and III on the ground of collateral estoppel.

## I. BACKGROUND

### A. Plaintiff's Military Service and Court–Martial

Plaintiff enlisted in the Marine Corps on February 11, 1991 for a term of six years of active duty and was assigned to Camp Lejeune, North Carolina. Complaint ¶ 1. After his enlistment, plaintiff received military pay and, after his marriage in 1993, received additional pay in the form of a "basic allowance for quarters" ("BAQ") as provided for by statute. *Id.* ¶¶ 17, 24–26. Throughout 1993 and 1994, plaintiff complained of knee pain, resulting in various medical treatments and duty restrictions. *Id.* ¶¶ 21–23, 31–32, 38, 40. In January 1995, a Physical Examination Board determined that plaintiff was unfit for duty because of his knee pain and assigned plaintiff a "disability rating" of ten percent. *Id.* ¶ 60. The following month, the Secretary of the Navy approved plaintiff's "discharge for physical disability with severance pay" and ordered the discharge effective "by 1 March 1995." *Id.* ¶¶ 65–66; Complaint Exh. 7 at 1. However, the order included an instruction automatically revoking the discharge if plaintiff were found "in a disciplinary status." Complaint ¶ 67.

Several months earlier, in November 1994, two enlisted Marines, Corporal Cook and Lance Corporal Gantz, were arrested at Camp Lejeune for possession and use of marijuana. *Id.* ¶ 41. The pair implicated plaintiff as their drug supplier, causing Naval Criminal Investigation Services ("NCIS") and civilian law enforcement to initiate an investigation of plaintiff. *Id.* ¶¶ 45–50, 72. At some point between February 28 and March 2, 1995—either one day before or one day after plaintiff's scheduled disability discharge—plaintiff was placed in a "disciplinary status" pending the outcome of the NCIS investigation. *Id.* ¶¶ 72, 74, 81. The Marine Corps did not discharge plaintiff on March 1, asserting that the "disciplinary status" be-

came effective, thereby revoking the orders directing plaintiff's discharge, on February 28. *Id.* ¶¶ 71, 74; Complaint Exh. 8 at 1; Complaint Exh. 10 at 1–2. Instead, plaintiff was retained on active duty, and NCIS continued its investigation into allegations of plaintiff's drug dealing. Complaint ¶¶ 71–74. In April 1995, several charges of violations of the Uniform Code of Military Justice ("UCMJ") were brought against plaintiff, including charges of possession and distribution of marijuana. *Id.* ¶¶ 78, 82. In May 1995, the charges were referred to a general court-martial. *Id.* ¶ 83.

On July 14, 1995, plaintiff failed to report for duty and was placed in an "unauthorized absence" status, resulting in the suspension of his pay and allowances. *See id.* ¶ 85; Complaint Exh. 11 at 1. One month later, plaintiff was placed in a "deserter" status and "dropped from the rolls" of the Marine Corps because of his continued absence. *See* Complaint ¶ 86; Complaint Exh. 11 at 1. On January 28, 1997, plaintiff was arrested by civilian law enforcement at Houston Intercontinental Airport in Houston, Texas for possession of over thirty-eight pounds of marijuana. *Id.* ¶ 96. Texas authorities brought civilian charges against plaintiff, but agreed to drop the charges to allow the USMC to take custody of and prosecute plaintiff after NCIS learned of plaintiff's arrest and contacted the Texas authorities. *Id.* ¶¶ 97, 99.

On March 3, 1997, plaintiff was returned to the custody of the USMC. *Id.* ¶ 102. Starting on that date, plaintiff once again began receiving his salary from the USMC, but it did not include the "basic allowance for quarters" that plaintiff had received after his 1993 marriage. *Id.* ¶¶ 103–04. On March 24, 1997, a slew of new charges were brought against plaintiff, including conspiracy to distribute marijuana in violation of article 81 of the UCMJ, desertion for the period from July 14, 1995 to January 28, 1997 in violation of article 85 of the UCMJ, and several charges of possession and distribution of marijuana in violation of article 112 of the UCMJ. *Id.* ¶ 105. On May 29, 1997, the charges were referred to a general court-martial. *Id.* ¶ 106. On August 7, 1997, the court-martial convened and convicted plaintiff of five of the charges relating to possession and distribution. *Id.* ¶¶ 114, 129. The court-martial entered a verdict of "not guilty" to the charge of desertion because the government failed to proffer evidence as to one of the elements of the crime. *Id.* ¶ 128. Plaintiff was sentenced to ten years confinement, total forfeiture of all pay and allowances, reduction to E–1 pay grade, and a dishonorable discharge from the USMC. *Id.* ¶ 133. The pay forfeiture sentence was imposed on August 22, 1997. *Id.* ¶ 134.

On January 14, 1998, the convening authority approved the findings of the court-martial and its sentence pursuant to the UCMJ. *Id.* ¶ 135. Shortly thereafter, plaintiff's case was brought before the Navy–Marine Corps Court of Criminal Appeals ("NMCCA") for automatic appellate review, also pursuant to the UCMJ. *Id.* ¶ 136. Plaintiff's then-counsel submitted a brief to the NMCCA alleging a variety of trial errors. *Id.* ¶ 146. On April 29, 1999, the NMCCA set aside the convening authority's approval of plaintiff's conviction and sentence because plaintiff's counsel had failed to present "clemency matters" to the convening authority. *Id.* ¶¶ 146, 152; *see United States v. Lowe,* 50 M.J. 654 (N.M.Ct.Crim.App.1999).

On February 17, 2000, a new convening authority reviewed plaintiff's court-martial in accordance with the order of the NMCCA. *Id.* ¶ 155. This convening authority approved the findings of the court-martial and the sentence, except for the length of imprisonment, which was reduced from ten to nine years. *Id.* On March 8, 2000, plaintiff's case was again brought before the NMCCA, which this time affirmed plaintiff's conviction and sentencing. *Id.* ¶¶ 156–58. On July 2, 2001, the NMCCA granted a motion for reconsideration filed by plaintiff. *Id.* ¶ 160. Between July 2001 and March 2002, plaintiff filed, *pro se,* a variety of briefs with the NMCCA. *Id.* ¶¶ 161–64. On August 28, 2003, the NMCCA again affirmed plaintiff's conviction and sentence. *Id.* ¶ 179. Plaintiff learned of the NMCCA's decision sometime after February 17, 2004. *Id.* Plaintiff did not petition the Court of Appeals for the Armed

Forces to review the decision of the NMCCA. *Id.*

### B. *Lowe I*

On June 10, 2002, while still serving the prison sentence imposed by the court-martial, plaintiff filed a complaint in the United States Court of Federal Claims alleging that the USMC unlawfully retained him in an active-duty status after March 1, 1995, thus wrongfully denying him a disability discharge with severance pay. *Id.* ¶¶ 166–67. Plaintiff requested that the court grant him a disability discharge, pursuant to 10 U.S.C. § 1203[1] *[hereinafter* "the Disability Separation Statute"] and a disability severance payment, pursuant to 10 U.S.C. § 1212[2] *[hereinafter* "the Disability Severance Payment Statute"]. *See id.* Senior Judge Yock dismissed plaintiff's complaint for lack of subject matter jurisdiction. *Id.* ¶ 170; *see Lowe v. United States ("Lowe I"),* No. 02–664C (Fed.Cl. April 23, 2003).

The court first observed that plaintiff was not discharged from the military due to disability pursuant to the Disability Separation Statute. *Lowe I,* slip op. at 16. Looking at the plain language of the Disability Severance Payment Statute, the court recognized that the statute only applied upon separation from the military under the Disability Separation Statute. *Id.* Based on that plain meaning, the court reasoned that the Disability Severance Payment Statute could serve as a money-mandating source *only* for a service member who is first separated from his service pursuant to the Disability Separation Statute. *Id.* The court held that because plaintiff had not been separated pursuant to the Disability Separation Statute, the Disability Severance Payment Statute could not mandate the payment of any moneys to him

and thus could not serve as a money-mandating statute for jurisdictional purposes. *Id.*

Plaintiff, however, did not just fail to be separated under the Disability Separation Statute; plaintiff was not separated from the Marine Corps *at all. Id.* at 17–18. The court also determined that it could not grant plaintiff the monetary relief that he sought, which would require ordering the Secretary of the Navy to separate plaintiff pursuant to the Disability Separation Statute. *Id.* at 17. The court held that although it had the collateral equitable jurisdiction to correct the status of a person already separated from the military incidental to granting monetary relief, it could not order the Secretary of the Navy to separate plaintiff from the USMC pursuant to the Disability Separation Statute because the court lacked "the primary equitable jurisdiction necessary to order the separation of the plaintiff from the Marine Corps in the first instance." *Id.* Furthermore, the court held that it lacked jurisdiction over a claim "seek[ing] appointment to a position which the plaintiff never held—in this case, the position of a discharged service member." *Id.* Although plaintiff contended that he held the status of "unfit for duty" and sought pay and allowances arising from that status, the court held that "plaintiff would had to have been separated from the Marine Corps," in order to be eligible for the disability severance pay that plaintiff sought because the "unfit for duty" status did not by itself entitle plaintiff to severance pay. *Id.* Plaintiff, who was still on active duty, needed to be discharged to even be eligible for disability severance pay, but the court reiterated that it could not issue a declaration that plaintiff was to be separated from the Marine Corps. *Id.* at 17–18.

Senior Judge Yock thus dismissed all of plaintiff's claims in *Lowe I* for lack of subject

---

**1.** § 1203 provides, in pertinent part:
(a) Separation
Upon a determination by the Secretary concerned that a member described in section 1201(c) of this title is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay or while absent as described in section 1201(c)(3) of this title, the member may be separated from the member's

armed force, with severance pay computed under section 1212 of this title, if the Secretary also makes the determinations with respect to the member and that disability specified in subsection (b).

**2.** § 1212 provides the formulas for computing the disability severance pay that service member is entitled to "[u]pon separation from his armed force under section 1203 or 1206 of this title."

matter jurisdiction.[3] *Id.* at 19.

## C. The Instant Complaint

On February 17, 2006, plaintiff filed the instant six-count Complaint. Complaint at 30–31. The Complaint contains three topical pairs of claims. The first consists of Counts I and III. In Count I, plaintiff alleges that he was unlawfully discharged and is entitled to a disability discharge or an honorable discharge "pursuant to 10 U.S.C. § 1201, et seq., SECNAVINST 1850.4C, and 37 U.S.C. § 204."[4] *Id.* Count III seeks the same relief as Count I, but identifies a constitutional basis for the claim; specifically, plaintiff asserts "property interests in the benefits of a disability discharge with severance pays pursuant to 10 U.S.C. § 1203," which were taken without compensation in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. *Id.* Both Counts I and III are identical to the claims for which plaintiff sought relief in *Lowe I,* but, as will be discussed later, plaintiff now proffers the new allegation that *Lowe I's* jurisdictional bar no longer applies because he is now separated from the military. Pl.'s Resp. to Def.'s Mot. to Dismiss at 24, 26–29.

Counts II and IV comprise the second pair because they, viewed together, comprise a collateral attack on the jurisdiction of the court-martial and the sentence it imposed. Specifically, Count II collaterally attacks the jurisdiction of the military court-martial, and seeks "military pays [sic] pursuant to 37 U.S.C. § 204," which plaintiff claims he would have received had he not been subject to an allegedly unlawful court-martial. *Id.* Relatedly, Count IV collaterally attacks the sentence imposed by the court-martial, seeking "military pays and allowances pursuant to 37 U.S.C. §§ 204 and 403" for the period from August 22, 1997 to February 17, 2000, during which time plaintiff's pay forfeiture sentence had been imposed but not approved by the second convening authority, "in violation of the ex post facto clause of the United States Constitution." *Id.* In other words, plaintiff asserts in the mirror image Counts II and IV that the court-martial's jurisdiction and sentence are constitutionally flawed, and thereby seeks to recover the status and funds that plaintiff forfeited by being convicted and dishonorably discharged.

In the final pair of counts, Counts V and VI, what is sought is restitution of both back pay and the allowance for quarters. In Count V, plaintiff seeks "military pays" (sic) for the period from July 14, 1995 to March 3, 1997, during which time plaintiff was absent from duty but for which he was later acquitted of the charge of desertion. *Id.* And lastly, in Count VI, plaintiff seeks the "basic allowance for quarters" for the period from March 3, 1997 to August 22, 1997, during which time plaintiff was on-base after being returned to U.S.M.C. custody but had not yet received the sentence forfeiting his pay. *Id.*

---

**3.** *Lowe I* also contained other observations, albeit in dicta, because they were not necessary to the court's holding that it lacked subject matter jurisdiction over Lowe's claim. Senior Judge Yock noted that the statute of limitations was tolled by SCRA while Lowe was on active duty, so Lowe's complaint was not time-barred. *Lowe I* at 8–10. Additionally, the court found that SCRA did apply to plaintiff despite his unauthorized absence from base, at least in response to an initial motion to dismiss for lack of subject matter jurisdiction, because Lowe never admitted that he was absent without leave, the court-martial found him "not guilty" of desertion and the lesser included offense of unauthorized absence, and the court was required to accept all facts in the complaint as true and make all reasonable inferences in favor of Lowe. *Id.* at 12–14. Senior Judge Yock also highlighted the difference between disability retirement and disability separation, and based on the plain meaning of the statutes, opined that plaintiff would not be eligi-

ble for disability retirement under 10 U.S.C. § 1401 because plaintiff served less than 20 years and had a disability rated at 10 percent. *Id.* at 10–12 & n. 4. Finally, Judge Yock determined that the Marine Corps' decision to place Lowe in an administrative disciplinary status, thereby revoking his discharge orders, was nonjusticiable because the court could not identify any "tests or standards" by which it could ascertain the correctness of the Marine Corps' action. *Id.* at 18–19.

**4.** 10 U.S.C. §§ 1201–1221 comprise Title 10, Subtitle A, Part II, Chapter 61 of the United States Code, which sets forth the law concerning the retirement and separation for disability of military personnel. SECNAVINST 1850.4C is a military regulation detailing the Navy's procedures concerning disability rating, evaluation, and consequences. 37 U.S.C. § 204 is the military pay statute.

Defendant responded to plaintiff's Complaint by filing a motion to dismiss for lack of subject matter jurisdiction, which is currently before this Court. *See* Def.'s Mot. to Dismiss.

## II. DISCUSSION

In its motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), defendant argues two theories: first, that all of plaintiff's claims are barred by the Tucker Act's six-year statute of limitations; and second, that Senior Judge Yock's decision in *Lowe I* bars Counts I and III of plaintiff's claim pursuant to the doctrine of collateral estoppel. Def.'s Mot. to Dismiss. at 8–11 & 11–15. Of course, this Court has an independent duty to determine the grounds for jurisdiction and can raise the issue *sua sponte*, and thus can decide the motion on any jurisdictional mooring. *See Fisher v. United States*, 402 F.3d 1167, 1173 (2005) *(en banc* in relevant part).

Generally, it is the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), which grants jurisdiction to the Court of Federal Claims to hear claims against the United States arising under the Constitution, an act of Congress, a regulation of an executive department, an express or implied contract, and liquidated or unliquidated damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1) (2000). This jurisdiction extends only to claims for money damages, *United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *see also Fisher*, 402 F.3d at 1172, because waivers of sovereign immunity must be strictly construed. *See United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980).

It is worth mentioning that although the Tucker Act confers jurisdiction upon the Court of Federal Claims, the Tucker Act does itself not create a substantive right enforceable against the United States for monetary damages. *Id.; Testan*, 424 U.S. at 398, 96 S.Ct. 948; *see also White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1372 (Fed.Cir.2001). "Instead, to invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship, constitutional provision, statute, or reg-

ulation that provides a substantive right to money damages." *Khan v. United States*, 201 F.3d 1375, 1377 (Fed.Cir.2000). This is the burden that Lowe, as the plaintiff, must bear. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998).

With these precepts in mind, and as explained more fully below, the Court grants the government's motion, but only in part. The Court rejects defendant's clearly incorrect assertion that the statute of limitations bars all of plaintiff's claims. However, the Court agrees with defendant that collateral estoppel does affect plaintiff's claims, as the dismissal in *Lowe I* prevents plaintiff from re-litigating the subject matter jurisdictional basis for Counts I and III.

### A. Statute of Limitations

The government's statute of limitations contention is predicated upon the Tucker Act's six-year requirement to commence an action. *See* 28 U.S.C. § 2501 (2006) ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). The reason that this is a proper basis for a Rule 12(b)(1) motion is that the Federal Circuit has held that the issue of whether a claim falls within this six-year period goes to subject matter jurisdiction. *See John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed.Cir.2006) (holding that "[t]he six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims"), *cert. granted*, — U.S. ——, 127 S.Ct. 2877, 167 L.Ed.2d 1151 (2007). Generally, a claim accrues, and the period of limitations begins to run, when all events necessary to fix the Government's liability have occurred, thereby entitling claimant to demand money. *See Henke v. United States*, 60 F.3d 795, 799 (Fed.Cir.1995) (citing *L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1365 (Fed.Cir.1982)).

Defendant proffers several arguments in support of its overall lack-of-timeliness argument. Noting that plaintiff did not file this action until February 17, 2006, the government maintains that Counts I and III—plain-

tiff's claims for disability severance pay—are untimely because these claims accrued on March 1, 1995, the date when plaintiff was to be discharged with a disability severance. Def. Mot. to Dismiss 13–14. Similarly, Counts IV and VI—plaintiff's claims for back pay from August 22, 1997 to February 17, 2000 and for back BAQ payments from March 3, 1997 to August 22, 1997—accrued, defendant asserts, on August 22, 1997 and March 3, 1997, respectively, because those are the dates when plaintiff stopped receiving the payments in question. *Id.* at 14–15. Finally, Defendant argues that Count V—plaintiff's claim for back pay from July 14, 1995 to March 3, 1997—accrued at the latest in 1995 when plaintiff's pay was first suspended, and alternatively, certainly no later than the first payday following plaintiff's August 1997 acquittal for the criminal desertion charge for the time period in question.[5] *Id.*

Plaintiff counters that the statutes of limitations period was tolled by application of the Service members' Civil Relief Act ("SCRA") until his formal discharge from the Marine Corps on February 17, 2004. *See* 50 U.S.C. app. § 526(a) (2006).[6] Plaintiff simply contends that the six-year limitations period is tolled by operation of law until his discharge date and that the complaint *subjudice* was filed well within the permissible period reflecting the intermix of both the Tucker Act and SCRA. Plaintiff is correct.

Recognizing the special hardship that military duty has imposed on those serving their country, SCRA suspends various civil liabilities of persons in military service. *See* 50 U.S.C. app. §§ 501–96; *Conroy v. Aniskoff,* 507 U.S. 511, 512, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993); *see also Diamond v. United States,* 170 Ct.Cl. 166, 344 F.2d 703,

706 (1965) ("The express purpose of the Civil Relief Act is, by means of the temporary suspension of certain legal proceedings which might prejudice the rights of persons in military service, 'to enable such persons to devote their entire energy to the defense needs of the nation' ") (quoting Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. app. § 510 (1958)). The Act has existed in various forms and under different names since 1918, but has always included a provision requiring the tolling of statutes of limitations for service members during their periods of military service. *See* Service members Civil Relief Act, Pub.L. No. 108–189, § 206, 117 Stat. 2835, 2844 (2003) (codified at 50 U.S.C. app. § 526(a) (2006)); Soldiers' and Sailors' Civil Relief Act of 1940, Pub.L. No. 76–861, § 205, 54 Stat. 1178, 1181 (1940); Soldiers' and Sailors' Civil Relief Act of 1918, Pub.L. No. 65–103, § 205, 40 Stat. 440, 443 (1918).[7] It is worth repeating the Act's tolling provision:

> The period of a service member's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of ... the United States by or against the service member....

*Id.* Because the language of the statute is unambiguous and unequivocal, courts have long held that SCRA "make[s] certain that the tolling of the statute of limitations is unconditional." *Bickford v. United States,* 228 Ct.Cl. 321, 656 F.2d 636, 639 (1981); *see also Conroy,* 507 U.S. at 514, 113 S.Ct. 1562 (interpreting a different provision within the same section of the Act and holding that

---

**5.** Defendant makes no reference to Count II—plaintiff's claim for back pay for the period following his court-martial—and makes no assertion as to when this claim accrued.

**6.** SCRA provides in pertinent part: "The period of a service member's military service *may not be included* in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of ... the United States by or against the service member...." Service members' Civil Relief Act, Pub.L. No. 108–189, § 206, 117 Stat.

2835, 2844 (2003) (codified at 50 U.S.C. app. § 526(a) (2006)).

**7.** In 2003, Congress amended the SCRA of 1940, and as part of a general revision, moved the tolling provision then in place at 50 U.S.C. app. § 525 (2000) (Act Oct. 17, 1940, ch 888, § 205, 54 Stat. 1181; Oct. 6, 1942, ch 581, § 5, 56 Stat. 770; March 18, 1991, P.L. 102–12, § 9(6), 105 Stat. 39) to the current 50 U.S.C. app. § 526 (2006) in the general revision of Act Oct. 17, 1940, ch 888, by § 1 of Act Dec. 19, 2003, P.L. 108–189.

"[t]he statutory command ... is unambiguous, unequivocal, and unlimited").[8] Consequently, the only real issue in triggering the Act's tolling provision is exactly what constitutes "military service." *Bickford,* 656 F.2d at 639 (citing *Ricard v. Birch,* 529 F.2d 214, 217 (4th Cir.1975)). To be sure, once that military service has been shown, the period of limitations is automatically tolled for the duration of the service. *Id.; see also Diamond,* 344 F.2d at 706 ("First, the pertinent section of the Civil Relief Act, 50 U.S.C. app. § 525, halts the operation of statutes of limitations only 'during the period of military service' "). *See generally* Romualdo P. Eclavea, *Tolling Provision of Soldiers' and Sailors' Civil Relief Act (50 App. U.S.C.A. § 525),* 36 A.L.R. FED. 420 (2007) (collecting case law from various jurisdictions recognizing the mandatory nature of the Act's tolling provision and construing this provision liberally in accordance with the Act's remedial nature).

As for the term "military service," it encompasses those personal on "active duty, as defined in section 101(d)(1) of title 10, United States Code [essentially, those serving in the U.S. Army, Navy, Marine Corps, Air Force, and Coast Guard], and ... any period during which a service member is absent from duty on account of sickness, wounds, leave, or other lawful cause." 50 U.S.C. app. § 511(2); *see also* 10 U.S.C. § 101(d)(1) (defining "active duty" as "full-time duty in the active military service of the United States"). Significantly, SCRA defines "period of military service" as "the period beginning on the date on which a service member enters military service and ending on the date on which the service member is released from military service or dies while in military service." 50 U.S.C. app. § 511(3).

Plaintiff avers, and defendant does not dispute, that plaintiff entered military service on February 11, 1991 (Complaint ¶ 1; Def.'s Mot. To Dismiss 2). Because plaintiff's claims accrued after that date, the critical determination in this case is the date on which plaintiff was released from active duty. *See* 50 U.S.C. app. § 511(2). On plaintiff's release from active duty, the tolling provision of SCRA ceased to operate, and the six-year statutory period of limitations began to run. *See Diamond,* 344 F.2d at 706.

In determining the date that plaintiff was released from active duty, the Court is guided by 10 U.S.C. § 1168(a) (2006), which states clearly and unambiguously that "[a] member of an armed force may not be ... released from active duty until his ... certificate of release from active duty ... and his final pay or a substantial part of that pay, are ready for delivery to him...." 10 U.S.C. § 1168(a). In implementing this statute, the Department of Defense created a specific form, "DD Form 214," to serve as the certificate of release. 32 C.F.R. § 45.2 (2007). The Department of Defense has expressly stated that DD Form 214's purpose includes providing "[a]ppropriate governmental agencies with an authoritative source of information which they require in the administration of Federal ... laws applying to personnel who have been discharged [or] otherwise released ... while on active duty." *Id.* Plaintiff's DD Form 214 is thus authoritative in determining when the tolling provision of SCRA ended.

The precise receipt date of plaintiff's DD Form 214 is unclear in the record before the Court. Plaintiff does aver, and defendant agrees, that plaintiff was discharged from the Marine Corps on February 17, 2004. Complaint ¶ 1; Def.'s Mot. to Dismiss at 2. Given

---

**8.** Both *Bickford* and *Conroy* interpreted section 205 of the Soldiers' and Sailors' Civil Relief Act of 1940, codified at 50 U.S.C. app. § 525 (2000), which became section 206 of the current-day SRCA—the tolling provision at issue here—after Congressional amendments in 2003, codified at 50 U.S.C. app. § 526 (2006). Neither the substance of SCRA after its 2003 amendment nor the unambiguous nature of its language differs from the earlier version. *Compare* 50 U.S.C. app. § 525, ("The period of military service shall not be included in computing any period now or hereafter to be limited by any law, regulation, or order for the bringing of any action or proceeding in any court, ... department, or other agency of government by or against any person in military service ....") *with* 50 U.S.C. app. § 526(a) (2006) ("The period of a service member's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, ... department, ... or the United States by or against the service member....").

plaintiff's own averment that he was discharged on February 17, 2004, and factoring in the presumption of bureaucratic regularity, *see, e.g., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), there is no reason to conclude that the Marine Corps did not have the Form *"ready* for delivery" by that date. Accordingly, logic dictates that plaintiff could not have been released from active duty before February 17, 2004, and the tolling provision of SCRA should apply through that same date. *See* 10 U.S.C. § 1168(a); 50 U.S.C. app. § 526(a); 32 C.F.R. § 45.2.

■ However, this is not the end of the story. Trying to punch a hole in SCRA's statutory scheme tolling statutes of limitations when service members are on active duty, defendant asserts that plaintiff was not on active duty for critical periods of the Complaint. Specifically, defendant contends that plaintiff's period of military service ended not in February, 2004, but instead terminated on January 28, 1997, when Texas police arrested plaintiff for drug possession before transferring him to the custody of the Marine Corps for prosecution. Def.'s Supp. Br. 5. In other words, the gist of defendant's argument is that a serviceman cannot be considered on "active duty" when incarcerated, presumably because incarceration, which by definition is punitive in nature, is the antithesis of active duty's call to serve by performing military functions. *Id.*

To support this contention, defendant relies heavily on an Ohio trial court's bare assertion that "the benefits of the [SCRA] are extended to those who are in active service or duty and do not inure to benefit or protect those who through their voluntary aggressions and conduct remove themselves from the role of soldiers and sailors in active service or duty." *See Mantz v. Mantz,* 69 N.E.2d 637, 639 (Ohio Com.Pl.1946). Al-

though this language may reflect seemingly useful policy, the court offered no authority for its holding other than its own belief that a contrary position would be "asinine." *See id.* Federal courts, however, are not policymakers. Consequently, no court within this Circuit—nor any federal court, for that matter—has followed *Mantz,* and this Court declines defendant's invitation to do so. Instead, this court is bound by the clear, unambiguous language of the statutory framework: that plaintiff remained on active duty until February, 2004, when the "DD Form 214" was ready for delivery to him. Defendant's arguments to the contrary are wholly inconsistent with the plain meaning of SCRA, and, as such, are unavailing.

Defendant also relies upon two federal cases, *Stone v. United States,* 4 Cl.Ct. 250 (1984), and *Borys v. United States,* 201 Ct.Cl. 597, 1973 WL 21342 (1973), for the proposition that an incarcerated serviceman is not on active duty. However, neither of those cases involved SCRA, and, more importantly, both involved servicemen incarcerated by *civilian* authorities in *civilian* facilities. *Stone,* 4 Cl.Ct. at 252–53; *Borys,* 201 Ct.Cl. at 601. Both courts held that a service may refuse to "excuse as unavoidable" a service member's absence from duty on account of civilian confinement under 37 U.S.C. § 503(a), a statute governing payment of wages to servicemen absent without leave. *See Stone,* 4 Cl.Ct. at 257; *Borys,* 201 Ct.Cl. at 609–10. Indeed, the underlying issue facing these courts is analogous to a problem plaguing civilian courts throughout American history: that of asserting jurisdiction over military personnel for alleged violations of civil law when those service members were either off-duty or absent without leave.[9] Notwithstanding, neither case adjudicated the instant issue: whether *military* confine-

---

9. Instructive is *O'Callahan v. Parker,* 395 U.S. 258, 259–60, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), where the Supreme Court held that a court-martial was without jurisdiction to try an Army sergeant who, during peacetime, while on an evening pass and while dressed in civilian clothes, assaulted and attempted to rape a young girl. The court opined that, under the circumstances of the case, the Army sergeant could not be deprived of his Constitutional right to indict-

ment by a grand jury and a trial by a petit jury because the sergeant's crime was not "service-connected" and was not one "arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." *Id.* at 272, 89 S.Ct. 1683. *See generally* Donald T. Kramer, Comment–Note, *Courts–Martial Jurisdiction over Members of Armed Forces for "Civilian" Offenses,* 14 A.L.R. Fed. 152 (2007).

ment of a service member who has not been discharged or separated constitutes "active duty." [10]

■ In the present case, plaintiff was not absent during the period of his military confinement but instead was present, in military custody, at the bases to which he was assigned by the Marine Corps. Furthermore, as discussed above, plaintiff remained on active duty during his military confinement because he had neither received his final pay nor was his DD Form 214 "ready for delivery." *See* 10 U.S.C. § 1168(a); 32 C.F.R. § 45.2. One can hardly consider plaintiff's confinement as not being "service-connected"—which this Court believes is the test for "active duty." *See* 10 U.S.C. § 101(d)(1); 50 U.S.C. app. §§ 511(2) & 511(3) (equating the term "military service" with "active duty"). Simply put, plaintiff was convicted and incarcerated for violations of the UMCJ relating to his actions while he served on active duty. For this Court to accept defendant's argument would be to denigrate the crucial role that law and regulation play in military discipline. Further, there exists a constitutional component to the Court's position. Failing to recognize that a service member is on active duty, even when incarcerated in the "brig" for violations of military law, until officially separated or discharged, ignores the near-plenary power that the Constitution delegates to Congress "to make Rules for the Government and the Regulation of the land and naval forces . . ." U.S. CONST., art. I, § 8, cl. 14. The Constitution clearly envisioned the promulgation of a special system of military justice, and this system has indeed become an essential part of the American military. *See O'Callahan,* 395 U.S. at 261–62, 89

S.Ct. 1683. It can hardly be said that those service members subject to that system— even when tried, convicted, and incarcerated under military law—are not engaging in activities that are "service-connected."

Thus, the period of limitations for this action began to run only on February 17, 2004, and having been filed on February 17, 2006, the Complaint falls well within the six-year period prescribed in the Tucker Act. *See* 28 U.S.C. § 2501; 50 U.S.C. app. § 526(a).

## B. Collateral Estoppel (Issue Preclusion)

Turning to collateral estoppel, which defendant argues requires the dismissal of Counts I and III, defendant asserts that this Court lacks jurisdiction because *Lowe I:* (1) decided identical issues, (2) which were actually litigated and gave plaintiff a full and fair opportunity to litigate his position, (3) and the resolution of those issues was necessary to the dismissal. Def. Mot. to Dismiss 7–8 & n. 3. Although defendant's legal argument perhaps is a bit too shallow to adequately justify a preclusive effect for *Lowe I,* the Court nonetheless (and as clarified below) finds that it lacks jurisdiction over Counts I and III because plaintiff has failed to allege a sufficient cure for the jurisdictional defect that mandated dismissal in *Lowe I.*

In Count I and Count III of the Complaint, plaintiff seeks the correction of his records to state that he was separated from the Marine Corps due to disability, and for the accompanying disability severance pay. For the purpose of determining whether this Court has subject matter jurisdiction to hear those claims, the two are essentially the same count.[11] As stated, in *Lowe I,* Judge Yock

---

10. Only the *Borys* court even considered the issue of whether a period of military confinement constituted "active duty," but it never reached the question because its holding was based entirely on the determination that *civilian* confinement is not 201 Ct.Cl. at 610–11. Only very cursorily, and without reference to any authority, did the court suggest that "in the special circumstances of [that] case" a period of military confinement would not be considered "active duty" for purposes of calculating retirement benefits. *See id.* at 611. To the extent that the *Borys* court's language might be considered a general statement regarding "active duty" status during military confinement, it is dictum and is not

binding on this Court. *See Lovelladies Harbor v. United States,* 27 F.3d 1545, 1549 (Fed.Cir.1994) (stating that dictum is "not accord[ed] . . . stare decisis effect").

11. In Count I of his Complaint, plaintiff asserts that he was entitled to a disability discharge from the Marine Corps, pursuant to the Disability Separation Statute, on March 1, 1995 and, therefore, is entitled to disability severance pay pursuant to the Disability Severance Payment Statute. In Count III of his Complaint, plaintiff asserts the same claim—entitlement to a disability severance payment—but, asserting that he has "property interests" in the entitlement, invokes the Due

had dismissed the corresponding claims for lack of subject matter jurisdiction, concluding that plaintiff did not properly identify a money-mandating statute because the cited Disability Severance Payment Statute did not compel payment to Lowe since he was not separated from active service during the relevant time pursuant to the Disability Act. Defendant contends that *Lowe I's* dismissal thus bars plaintiff from bringing his substantially similar claims before this Court, but never fully discusses the relevancy of plaintiff's attempted allegational cure to the jurisdictional defect in his new Complaint.

It is beyond cavil that the issue of collateral estoppel goes to subject matter jurisdiction, and may be pleaded as a 12(b)(1) motion. *See Schwasinger v. United States,* 49 Fed.Appx. 888, 888 (2002) (summarily affirming a collateral estoppel-based 12(b)(1) ruling against a plaintiff who had previously filed two similar complaints, "both of which were dismissed for lack of subject matter jurisdiction"); *Pacetti v. United States,* 50 Fed.Cl. 239, 241 n. 2 (2001) (addressing collateral estoppel, along with the statute of limitations, as a jurisdictional issue under 12(b)(1)). In considering whether to give preclusive effect

to a prior court's decision dismissing the claim for lack of subject matter jurisdiction, it is not always necessary to place the preclusive effect on one side of the hazy border between the doctrines of collateral estoppel (issue preclusion) and claim preclusion. While these two doctrines and their terminology are often blurred together,[12] they prevent parties from "getting two bites at the apple" through re-litigating rather than appealing a decision through the appropriate channels. Granting judgments preclusive effect upholds a "fundamental precept of common-law adjudication," that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties...." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (quoting *S. Pac. R.R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897)).

*Res judicata* operates to maintain the conclusive resolution of disputes, which is "central to the purpose for which civil courts have been established." *Id.* "[T]o preclude parties from contesting matters they have had a full and fair opportunity to litigate protects their

Process Clauses of the Fifth and Fourteenth Amendments as the money-mandating sources. The Fourteenth Amendment, of course, applies only to states and cannot support a claim against the federal government. *E.g., Hampton v. Mow Sun Wong,* 426 U.S. 88, 95, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *see* U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law...."). As for the Fifth Amendment claim, plaintiff could only acquire "property interests" in a government payment to which he is statutorily entitled. *See Atkins v. Parker,* 472 U.S. 115, 128, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985); *Pierre v. West,* 211 F.3d 1364, 1366–67 (Fed.Cir.2000). Thus, the predicate jurisdictional issues under this theory are the same as in Count I: whether plaintiff was, in fact, separated from the Marine Corps pursuant to the Disability Separation Statute and, if not, whether the court can order plaintiff's separation pursuant to the Disability Separation Statute. If not, there can be no entitlement in which plaintiff could have "property interests" and thus no money-mandating source sufficient to confer jurisdiction on this Court.

12. Many courts have held that *res judicata,* or claim preclusion, serves to bar reassertion of the same claim, whereas the more narrow collateral

estoppel serves to bar reassertion of specific issues within different claims. *See, e.g., Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Saladino v. United States,* 62 Fed.Cl. 782, 788 (2004) ("this court construes defendant's argument under the heading 'res judicata' to mean 'claim preclusion,' which the term 'res judicata' has come to signify. This is to be distinguished from 'issue preclusion,' also known as 'collateral estoppel.' "). *But see Citizen Elecs. Co. v. OSRAM GmBH,* 225 Fed.Appx. 890, 893 n. 2 (Fed.Cir.2007) ("The parties agree that *res judicata* is an umbrella term covering two types of preclusive effects of judgments: claim preclusion and issue preclusion."). For the purposes of clarity, we note that claim preclusion has come to incorporate the common law concepts of merger and bar. *See Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar."); *Jet, Inc. v. Sewage Aeration Systems,* 223 F.3d 1360, 1362 (Fed.Cir.2000) (citing *Migra* and observing that claim preclusion has come to incorporate the common law of merger and bar).

adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* at 153–54, 99 S.Ct. 970. Likewise, "collateral estoppel has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. at 326 & n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Morgan v. Dep't of Energy,* 424 F.3d 1271, 1274 (Fed.Cir.2005) ("Collateral estoppel serves two purposes. It protects litigants from the burden of relitigating an identical issue and promotes judicial economy by preventing needless litigation.").

■ Jurisdictional determinations are one such class of matters that typically have a preclusive effect. *See Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n. 9, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) ("It has long been the rule that principles of [finality] apply to jurisdictional determinations—both subject matter and personal."); *see also Entegris, Inc. v. Pall Corp.,* 490 F.3d 1340, 1346 (Fed.Cir.2007) (citing long-standing precedent that final judgment requires a decision "on the merits"). A trial court's determination that a statute "is money-mandating shall be determinative both as to the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his action." *Fisher v. United States,* 402 F.3d 1167, 1173 *(en banc* in relevant part). Unless the judgment ordering dismissal specifies otherwise, however, the mere *dismissal* of a claim for lack of subject matter jurisdiction does not operate as an adjudication of that claim on the merits. *New Jersey Institute of Tech. v. Medjet, Inc., [hereinafter "NJIT"]* 47 Fed.Appx. 921, 925 (Fed.Cir.2002) (citing Rule 41(b) in holding that "a dismissal for lack of jurisdiction does

not preclude a second action based on the same cause of action that includes claims that overcome the initial defect of jurisdiction."); RCFC 41(b) ("Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision of this rule and any dismissal not provided for in this rule, *other than a dismissal for lack of jurisdiction ...* operates as an adjudication upon the merits." (emphasis added)); *see also* RESTATEMENT(SECOND) OF JUDGMENTS § 20(1) (1982).[13] Accordingly, even without such a specification, a dismissal for lack of subject matter jurisdiction retains *some* preclusive effect, but only bars those matters that have been actually litigated—typically, the specific jurisdictional issue(s) that mandated the initial dismissal. *See Parklane Hosiery,* 439 U.S. at 326 n. 5, 99 S.Ct. 645 (observing that "the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action"); *Am. Guar. Corp. v. United States,* 185 Ct.Cl. 502, 401 F.2d 1004, 1005 (1968) (holding that a dismissal for lack of subject matter jurisdiction does not create a *res judicata* bar or collaterally estop subsequent re-litigation of the decided issue in a court of competent jurisdiction); RESTATEMENT (SECOND) OF JUDGMENTS §§ 17, 19–20 (1982).

However, and critical to the instant issue, even when actually litigated and decided, the jurisdictional determinations underlying a dismissal do not have preclusive effect if after the initial dismissal, plaintiff has "cured" the jurisdictional deficiency identified in the first suit. *See Vink v. Hendrikus Johannes Schijf Rolkan N.V.,* 839 F.2d 676, 677 (Fed.Cir.1988) ("A dismissal for lack of subject matter jurisdiction, on the other hand, is not a disposition on the merits and thus permits a litigant to refile in an appropriate forum."); *see also Citizen Elecs. Co. v. OSRAM GmBH,* 225 Fed.Appx. 890, 893 (Fed.Cir.2007) (applying the "curable defect

---

**13.** In *Young Engineers, Inc. v. United States International Trade Commission,* 721 F.2d 1305, 1314 (Fed.Cir.1983), the United States Court of Appeals for the Federal Circuit cited and quoted relevant provisions of the RESTATEMENT (SECOND) OF JUDGMENTS (1982) to determine issues of *res judicata,* collateral estoppel, and issue and claim preclusion. The Federal Circuit continues to

rely on the Restatement to guide its analysis of preclusion, and continues to cite *Young Eng'rs* for the proposition that it is guided by the Restatement. *See, e.g., Jet, Inc. v. Sewage Aeration Systems,* 223 F.3d at 1362 (citing *Young Eng'rs* for the proposition that "that Federal Circuit would receive guidance from RESTATEMENT (SECOND) OF JUDGMENTS (1982)").

doctrine" to the jurisdictional question at issue governed by D.C. Circuit precedent); RESTATEMENT (SECOND) OF JUDGMENTS § 20(2) (1982). While the same party alleging jurisdiction in a second action will be precluded from re-litigating the specific issue of fact or law determined against it in the first action (but only where it had full opportunity to litigate), *see NJIT* at 925–26 n. 12 (noting "that a dismissal for subject matter jurisdiction is not binding as to all matters which could have been raised." (internal quotations omitted)), preclusive effect does not bar issues that could have been actually litigated but were not. *See id.*

■ In summary, a prior dismissal on jurisdictional grounds does not prohibit a subsequent claim on the merits, because those merits have not been heard by the court; the prior dismissal *does* preclude the same action based on the same facts unless the jurisdictional flaw that necessitated dismissal of the first suit has been cured. Further, a determination whether a source is money-mandating decides that specific issue. If the alleged "cure" is sufficient to repair the prior jurisdictional defect, collateral estoppel does not apply to the prior jurisdictional determination because the issue of the court's subject matter jurisdiction over the case *as situated post-"cure"* has not yet been litigated.

■ Having now clarified the specific issues of preclusion currently before the Court, it is fairly easy to assess whether this Court has subject matter jurisdiction for Counts I and III of the Complaint. The parties involved in this case—Lowe and the government—are identical to the parties in *Lowe I.* Similarly, plaintiff relies upon two of the three statutes on which he relied on in *Lowe I*—the Disability Separation Statute and the Disability Severance Payment Statute—and again reads them together to argue that they mandate payment to him in Count I. Com-

plaint at 30; *Lowe I* at 10–12. In Count III, plaintiff again asserts that the Disability Severance Payment Statute mandates payment to him, as in *Lowe I*, though plaintiff asserts a parallel constitutional, rather than statutory, entitlement to the payments set forth in that same statute. Furthermore, despite plaintiff's attempt to "cure" the jurisdictional defects in *Lowe I*—by now alleging that he had actually been discharged and separated from military service prior to filing the instant Complaint—the underlying facts relevant to the jurisdictional issue remain unchanged and, thus, the issue of jurisdiction may not be re-litigated. This is because plaintiff's attempted "cure" does not cure. What is germane in *Lowe I* is the holding that the Disability Severance Payment Statute Severance mandates payment to a service member who, unlike plaintiff, was separated *pursuant* to the Disability Separation Statute. *Lowe I,* slip op. at 16. Plaintiff even now does not allege this. Simply put, plaintiff misconstrues the medicine needed to cure the jurisdictional defect because he apparently had misconstrued the holding of *Lowe I.*

To be sure, this Court agrees with the reasoning of Judge Yock in *Lowe I.* The Disability Severance Payment Statute provides *only* for payments "[u]pon separation from his armed force under [the Disability Separation Statute] or [section] 1206 of this title," [14] and provides a schedule for calculating the amount of the severance that a service member is entitled to after being separated pursuant to one of those two statutes. 10 U.S.C. § 1212 (2000). It is clear that the Disability Severance Payment Statute does not authorize payment for a service member separated from military service by any other means. The Disability Separation Statute, on which plaintiff relies to argue that the Disability Severance Payment Statute is money-mandating, allows but does not require the Secretary of the appropriate

---

**14.** Note that section 1206 cited above (on which plaintiff *does not* rely) does not apply to service members covered by the Disability Separation Statute (on which plaintiff does rely). 10 U.S.C. § 1206 (2000). Moreover, section 1206 is discretionary, and allows but does not require the Secretary in charge of a particular Armed Force to separate a partially-disabled service member from that Armed Force, with severance pay com-

puted pursuant to the Disability Severance Payment Statute. *Id.* Even under this discretionary determination, the appropriate Secretary cannot separate a service member under this section without making additional factual determinations about the length of the service member's military service, how and when the injury occurred, and the severity and permanence of the disabling injury. *See id.*

Armed Force to separate a service member who is physically unfit to perform his duties because of a service-related disability. 10 U.S.C. § 1203(a) (2000).

However, under this statute, the Secretary must also determine the service member's length of service, how and when the injury occurred, the potential permanence of the injury, and the severity of the injury before the Secretary can separate the service member under the Disability Separation Statute. *See* 10 U.S.C. § 1203(b). By plaintiff's own admission, his separation was effected *by dishonorable discharge*, not pursuant to the Disability Separation Statute. The plain language of the Disability Severance Payment Statute does not even authorize, let alone mandate, payment for service members separated other than by the Disability Separation Statute or section 1206; nor does either section 1206 or the Disability Separation Statute provide for dishonorable discharge. Plaintiff's alleged "cure" to the jurisdictional defect identified in *Lowe I* is therefore unavailing. Because plaintiff's asserted "cure" does not allege new facts sufficient to identify a relevant money-mandating statute as required by the Tucker Act, plaintiff remains bound by the jurisdictional determination in *Lowe I*. Accordingly, defendant's motion to dismiss Counts I and III of plaintiff's Complaint for lack of subject matter jurisdiction must be granted.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is **GRANTED IN PART.** This Court concludes that plaintiff's Complaint is not time-barred because SCRA tolled the statute of limitations until plaintiff was discharged from military service. However, this Court concludes that it is without jurisdiction to review Counts I & III because collateral estoppel bars plaintiff's attempt to re-litigate the uncured jurisdictional defect that mandated dismissal in *Lowe I*. Therefore, Counts I and III of the Complaint are **DISMISSED.**

**IT IS SO ORDERED.**